**In the Matter of ALFRAN CORPORATION, Debtor.**

**ALFRAN CORPORATION, Plaintiff,**

v.

**PARK ISLES, INC., Defendant.**

**Bankruptcy No. 79–859 T.**

United States Bankruptcy Court, M. D. Florida, Tampa Division.

Nov. 5, 1980.

Don M. Stichter, Tampa, Fla., for Alfran Corp.

Ric B. Levinson, Tampa, Fla., for Park Isles, Inc.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS an adversary proceeding instituted by Alfran Corporation (Alfran), the Debtor involved in the above–captioned pre–Code arrangement proceeding. The complaint seeks a declaratory relief, specifically a determination that a certain lease originally entered into by Albert F. Zacco and Park Isles, Inc. (Park Isles), the defendant involved in this adversary proceeding, is valid and is in full force and effect. Park Isles denied the continued validity of the lease and also filed a counterclaim in which it seeks a determination that the lease has been terminated; that Alfran now occupies the premises only as a month to month tenant and by virtue of a notice of termination given on May 31, 1979, Alfran no longer has a right to occupy the premises and Park Isles shall be ordered to vacate and surrender the premises.

The facts controlling this controversy as developed at the final evidentiary hearing can be summarized as follows:

Alfran is a Florida corporation and is currently engaged in business under the trade name of "Big Z Sandwich Shoppe" in Venice, Florida. At the time relevant to this controversy, Alfran was also operating a Western Auto dealership.

Park Isles is a Florida corporation engaged in real estate development and also owns a small shopping center in Sarasota county which consists of two buildings, one of which is presently partially occupied by Alfran. Mr. and Mrs. Hanchey are the principals of Park Isles and Mrs. Hanchey also acts as bookkeeper and handles Park Isles' rent checks.

The original lease in question, (Pl's. Exh. # 1) was executed on May 6, 1976, by Albert F. Zacco (Zacco) and Park Isles. Paragraph 2 of the lease provided for an initial term of one year and Paragraph 3 stipulated that the rent for the first year would be the sum of $350 per month. The lease also called for a $350 security deposit and it is undisputed that it was paid by Zacco. The lease authorized Zacco to assign the lease to a corporation without requiring the consent of Park Isles. The lease also authorized Zacco to make alterations or modifications of the premises, but only with the approval of Park Isles.

Paragraph 34 of the lease granted two options to Zacco provided proper notice of intent to exercise the options was given. The first option gave Zacco the right to renew the lease for a two year period, i. e. from June 1, 1977 to May 31, 1979. The second option gave Zacco an additional annual right to renew at the expiration of the

initial 2 year option term, but limited to a total of five annual renewals. The lease also provided for increased rental payments in the event Zacco exercised the options.

The record further reveals that Zacco took possession of the premises in June of 1976 and later assigned the lease to Alfran who is presently still in possession of a portion of the premises. Zacco originally operated a retail establishment under a trade name of "Wheel Power" and was engaged primarily in the sale and repair of lawn mowers. Shortly after the commencement of that operation, his supplier of lawn mowers went out of business and consequently Zacco was compelled to phase out his lawn mower sale operation.

At the suggestion of Mr. Hanchey, Zacco commenced to explore the possibility of obtaining a Western Auto dealership. He had several meetings with the representatives of Western Auto and some of these meetings were attended by Mr. Hanchey himself. The negotiations culminated in an agreement executed in late November of 1976 and Zacco obtained a Western Auto dealership for an initial investment of $50,000. The grand opening of the store took place in January of 1977 with Mr. Hanchey in attendance. In preparing for the opening of the Western Auto dealership, Zacco made substantial leasehold improvements in the premises, installing steel gates, pegboards, shelvings, etc. There is no dispute that Mr. Hanchey was aware of these improvements and did not voice any objections to them.

It is without dispute that Zacco never gave a written notice of his intent to exercise his option to renew at the end of the first year, but he contends that he orally informed Hanchey of his intention to renew the lease for the next two years and claims to have asked Hanchey whether or not he would require a written notice to that effect. According to Zacco, Hanchey responded that no written notice would be necessary. Hanchey, of course, denies that such a conversation ever took place.

In early June of 1977, the first month following the expiration of the original one year lease, Zacco paid $440 which was, in fact, higher than the monthly installments called for by Paragraph 3 of the lease. According to Mrs. Hanchey's testimony, at the time she accepted this check, she did regard the original written lease as still being in effect. Mrs. Hanchey now claims, however, that the lease was terminated the following month and the relationship of the parties was converted into a month to month tenancy when Zacco asked her to reduce the monthly rent back to $350, i. e. the stipulated monthly rent for the first year term, and she agreed to the reduction.

In August or September of 1978, or almost 1½ years into the alleged two year option renewal period, Zacco approached the Hancheys and discussed the possibility of opening a sandwich shop in part of the leased premises. In this connection, Zacco prepared actual plans for this operation and showed the plans to the Hancheys who approved the plans and Mr. Hanchey even made some suggestions for some changes to be made, such as moving a wall to the middle of the store. The record reveals that Zacco specifically asked the Hancheys whether the rent would be increased as a result of a sandwich shop operation. Mrs. Hanchey told Zacco that the rent would not be increased until "Zacco got on his feet." In due course, Zacco obtained various building permits and began the set up of the sandwich shop in approximately ½ of the rented premises and the remainder of the premises was still used by the Western Auto operation. Zacco advised Mrs. Hanchey of the progress of the remodeling which included numerous alterations of the premises, most of which were non–removable, and became a permanent part of the real estate. Among the improvements was the installation of a grease trap which was permanently installed at the cost of at least $600 or roughly the equivalent of two months rent. In addition, Zacco installed a three compartment sink with the necessary plumbing; a partition wall for the restaurant and the store; refurbished the bathrooms and kitchen; painted the walls and added electrical wiring. There is no ques-

tion that the remodeling and improvements were substantial and cost more than $4,000, which is the equivalent of one year's rent.

On June 19, 1979, Alfran filed its petition for relief under Chapter XI of the Bankruptcy Act and did not seek leave to reject its lease with Park Isles. Neither did the arrangement submitted by Alfran call for the rejection of the lease.

The sandwich shop opened for business in January of 1979. Sometime in early February of 1980, Mr. Hanchey decided to sell the property and found a prospective purchaser who expressed a willingness to buy the building, provided he could have full use of the entire property which, of course, meant the removal of Alfran as the lessee. It further appears that in February of 1980, Mr. Hanchey visited the premises and informed Zacco that he no longer had a lease. After that conversation, Zacco contacted his attorney who wrote to Mr. Hanchey on February 13, 1980 and proposed a modification of the lease (Pl's. Exh. # 2). On February 15, 1980, Mr. Hanchey, on behalf of Park Isles, sent a notice to Zacco and informed him that he considered the occupancy by Alfran to be a month to month tenancy and he decided to terminate the same as of March 31, 1980 (Pl's. Exh. # 3). On February 26, the attorney for Alfran responded to that notice and informed Hanchey that he considered any action by Park Isles which would affect Alfran's right of occupancy to be a violation of the automatic stay imposed by Bankruptcy Rule 11–44 and considered the lease to still be valid and in full force and effect. (Pl's. Exh. # 4).

This is the relevant factual background of the basic issue of this controversy which is whether the original lease entered into by the parties has any continuing validity or whether it was terminated by reason of Zacco's failure to renew the same in conformity with the provisions of the lease which required a written notice of the intention to renew. It is clear that neither Zacco nor Alfran ever gave Park Isles a written notice of the intention to renew. Alfran, in order to escape the consequences of its failure to give written notice, urges

that its lease is still valid because oral notice of renewal was given and Mr. Hanchey consented to the renewal, thus, Mr. Hanchey waived the written notice of renewal that was required under the circumstances. In the alternative, even if the claimed oral renewal was ineffective or the waiver was insufficient, it is urged that Mr. Hanchey is estopped to claim a termination of the lease because of his conduct and representations made directly to Alfran on which Alfran relied to its detriment.

The relationship between a landlord and tenant and their respective rights are codified in this state. Florida Statutes § 83.01 et seq. (1979). Florida Statute § 83.04 (1979) sets forth the proper procedure which governs renewal of leases.

It is the contention of Park Isles that this Statute requires a written notice to renew and if none is given, a written lease is converted to a tenancy at will or to a tenancy at sufferance. This proposition urged by Park Isles is not only not supported, it is actually refuted by judicial decisions interpreting § 83.04 of the Florida Statutes. In *Henry v. D.S.M. Co.*, 352 So.2d 1230 (Fla. DCA 1977), the court held that a total reliance on § 83.04 of the Florida Statutes (1975) is not justified in this case. Equitable considerations can vary the application of that statutory section, citing *Ledford v. Skinner*, 328 So.2d 219 (Fla. 1st DCA 1976). In *Ledford, supra* the court pointed out that the Statute does not inevitably require a written notice to renew a lease, and the totality of the circumstances which indicate strong equitable considerations may persuade the court to disregard the seemingly inflexible requirement of the Statute. Thus, in *S. Lemel, Inc. v. 27th Avenue Farmers Market, Inc.*, 126 So.2d 167 (Fla. 3d DCA 1961), the court held that an oral agreement to renew the lease, accompanied by a continued possession of the premises and payment and acceptances of rent justified the court to disregard the written notice requirement of § 83.04 of the Florida Statutes. In *Dugan v. Haige*, 54 So.2d 201 (Fla.1951) the court held that since the landlord was aware of the tenant's intent to

renew the lease, the fact that the notice to renew the lease was admittedly untimely, in fact, given only after the landlord's notice of intent to evict the tenant, was immaterial, especially since it appeared that the landlord was not harmed by the delay. A strong consideration of equitable principles was best stated in *Rader v. Prather*, 100 Fla. 591, 130 So. 15 (1930), where the court held that unless the tenant could pay both the rent and the expense of the repairs, it is not probable that he would have gone to the expense of making the repairs unless he had some assurance from the landlord that he would not be held to that portion of the contract pertaining to the payment of rent. This conduct of the landlord did mislead the tenant who honestly believed that a waiver was intended or consented to by the landlord. The Court went on to state that the fact that the landlord took no action for several months following the first default was persuasive enough to show that the parties must have made the agreement which is alleged to have been made. *Id.* 130 So. at 17.

Applying the foregoing general principles to the facts involved in the matter under consideration, it is evident that the lease between Zacco and Park Isles, assigned to Alfran, is still valid and in full force and effect in spite of the undisputed fact that the tenant did not give a written notice of the intent to renew the lease. This conclusion is based on the following:

First, there is persuasive evidence in this record that the Hancheys considered the lease to be valid and renewed in spite of the absence of a written notice and they did not change their mind until they found a buyer for the premises who expressly conditioned his purchase on his right to have the exclusive use of the entire building.

Even assuming that the actions of the Hancheys did not operate as a waiver of the written notice requirement of the lease, as well as § 83.04 of the Florida Statutes, there is no doubt that the totality of circumstances compel the conclusion that the doctrine of estoppel weighs heavily in favor of Alfran.

First, the Hancheys were active participants in Alfran's efforts to obtain the Western Auto dealership; second, the Hanchey's viewed, and were privy to, Zacco's efforts to make Alfran's business a success. It might be added that Zacco's effort was undertaken at a very substantial investment and that the majority of that investment, by its very nature being permanently affixed to the realty, will ultimately, inure to the benefit and produce a potential windfall to the Hancheys' if Alfran is deprived of the use of the premises.

The fact that Alfran paid less rent after the expiration of the initial term is without any significance. If a lease may be held to be valid in spite of a total non–payment of rent by the tenant, *Rader, supra*, it would be absurd indeed to conclude in the present instance that the actions of a tenant who did pay the stipulated increased rent during the first month of the renewal term, but who asked for a reinstatement of the original rent; made the reduced payments, thereby rendered a lease invalid. This is especially so in this case because the landlord agreed to a temporary reduction of the rent until the tenant got back on his feet. In sum, this Court is satisfied that whether on the theory of waiver or on the theory of equitable estoppel, the lease between Alfran and Park Isles is still valid and in full force and effect and Park Isles is not entitled to the declaration sought in its counterclaim. Of course, Park Isles is entitled to insist that Alfran pay the contractual rent and may revoke its temporary forgiveness of rent that was granted when Alfran opened the sandwich shop.

A separate final judgment will be entered in accordance with the foregoing.